My name is Tom Woodbury, and I'm here representing the appellants in this case. Your Honor, there are essentially four main issues before the Court today on the Lolo National Forest. And I'm going to try, if it pleases the Court, I'm going to basically try to sort of summarize or quickly go through the first two, which I believe are uncomplicated issues that are clearly controlled by recent precedents from this Court, and then try to focus the balance of my argument on two issues that are a little more complicated and very important issues of arguably first impression for this Court. The uncomplicated issues, Your Honor, have to do with the proxy-on-proxy approach for ensuring Ogro species viability in the Lolo National Forest. This Court is obviously familiar with its allowances to the Forest Service to rely on a proxy-on-proxy approach to ensure species viability. This is a case, Your Honor, though, where it's very clear as a matter of record that the proxies simply have not been ignored and have not been implemented as intended in the Forest Plan in 1986. And essentially those two proxies are old-growth acreage and condition of that habitat forest-wide, which was intended to be inventoried over the first five years of the plan, but due to budgetary considerations, the Forest Service was unable to do that. So we don't really have any idea how much old-growth there is in the Lolo National Forest. All we know is that they set aside 2 percent habitat as management area 21, which appears to be good old-growth habitat, but is hardly sufficient to ensure viability and diversity. And then the second proxy was the snag densities in the forest, which are important for nesting habitat, obviously, for old-growth species. And there what we have is a record of chronic inability to report since the Forest Plan was adopted, with increasing alarm from the Forest Service experts. And that issue simply was not even addressed in the EIS, in spite of the fact that they relied on snag retention guidelines to support their assertion that this project wouldn't even have any impact on snag-dependent species. You know, essentially what it comes down to is not so much that the Forest Service didn't even address the proxy-on-proxy approach in this case, or try to demonstrate compliance. Rather, it sort of skirted the whole issue by saying, oh, we can log over 1,000 acres and reduce snags without actually impacting any species that depend on snags or old-growth in an area of the forest, a 200-square-mile area of the forest, that is sorely deficient in old-growth habitat. It appears to be no more than 3% over the landscape. The other issue that is controlled, especially by this Court's recent decision in Lands Council v. Powell, and to a lesser extent by this Court's decision in Neighbors v. Cutty Mountain v. USFS, the First Neighbors case, is soils. Here, there's no dispute that the Forest Service did not verify the results or verify the model that it was utilizing for complying with soils productivity requirements. And they, in addition to that, they deferred collection of the relevant data until after the decision was made and the project was being implemented. Would you elaborate on that? There's two points that I think they raise in this regard. Number one, they said that in their own materials, that in this area, qualitative, not quantitative, is sufficient. And secondly, they list a series of references to the record for this Bayer, I guess it's B-A-E-R report, and transect samples and various other, I guess I'll call them data collection that they did in connection with soils. And like many of the things in this case, you know, you say X and they say Y, and we're having some trouble, I think, trying to square the arguments with the evidence. So if you could help on that, I would appreciate it. Yeah. And I actually, in that context, would like to correct an oversight in our reply brief at page 29. I quoted from actually the regional office and John Nesser, who was actually the soil scientist that developed the regional soils quality standards. And I didn't include a citation of the record, and it actually responds to these issues quite well. And the record site is volume 10, document G, as in girl, 14, page 614. That does us almost no good. What we need is an E-R or an S-E-R site. Do you have that? I only discovered that, I only discovered this while I was preparing for our arguments this week. And I will say that it's been hard to understand your records and the briefs. And when we started to read the briefs and try to cross reference, when you have things in your briefs that aren't in the record and you don't give us an S-E-R site, we don't have any meaningful way to evaluate that. I do apologize for that, Your Honor. And it was a hard lesson, but a valuable one for me to go through and redo all the briefs and certainly try to be more conscientious about this. And unfortunately, in that process, I overlooked this. I certainly would be happy to provide this as a supplement at the, you know, quickly for the court. No, it is in the administrative record. I'm sorry, Your Honor? It is in the administrative record. It is in the administrative record, and it was comments from the regional office soil scientists on the draft E-I-S. So it's in the administrative record.  So it's in the administrative record. Why don't we have a little piece of paper that the clerk has for supplemental citations. Why don't you give us the record site on that and provide a copy to counsel for the government as well. Okay, Your Honor, I'll be happy to do that. But basically what Mr. Nesser says is that the L-S-I units that they use for burn severity are inadequate for demonstrating compliance or even indicating compliance with the standards. And she also makes it very clear that, you know, that you're basically talking apples and oranges with the impacts of fire on soils. The soils standard actually doesn't even address fire impacts on soils. And it addresses the impacts of prior timber harvest or management activities on those soils. So and also, of course, the the transects that were conducted by the bear team were not in the project area, but were simply in the fire perimeter area. So there's no way and why the Forest Service didn't respond to its own soil scientists from the regional office in those comments is not clear. This issue is not addressed in the E-I-S other than to say we will collect the data later on when during project implementation. And that's the same issue that was before the court in Mabers and Cutting Mountain where he said it's not proper to demonstrate compliance with the standard later and decide to go forward with the project now without that data available to the public. The two and the only other thing I would point out. So your position is that none of these studies cover the project area, the analysis, the they may actually be in the project area broadly defined. But what the standard is, is for the activity areas, which are the harvest units. And basically the idea is to identify impacts from past timber harvest in those units. And then that obviously requires actual data and measurements from those units. What is, does Lands Council say something about whether the models predictions have to be verified on the ground? Yeah. And that was actually my next point, because what's important to realize about this, the standard from the from the region, the 15, the so-called 15 percent detrimental disturbance of soils threshold is that this is a proxy itself for soils productivity. And when they adopted that standard, they actually recognized the Forest Service that it was necessary to validate that. I mean, there was no science that said, you know, and soils productivity is a measurement of tree growth, basically, and the ability of if you plant a tree next to a road or some compressed soils, the roots cannot spread out and it retards growth, which is obviously important. And so they basically said, we will validate this, the assumptions underlying this standard over time. And it's been more than a decade and they've not done that. And the College Center actually filed the Freedom of Information Act request that that's in the jewel declaration. And they asked specifically for that information and they said no document exists that's responsive to this request. And then so so that's, you know, right at the heart of the issue. So but even assuming that the 15 percent detrimental disturbance standard is itself valid, then you still have to verify it on on site with site specific information by going out and measuring the aerial extent of detrimental disturbance. And so just to in the Lands Council, there was only a spreadsheet model. Yes. So you didn't have even the situation here where you had project data that had been verified on the ground. Is that correct? Actually, there's they relied on spreadsheet models in this case as well. They're included in the record as well. So it's the same. But I guess my question is, is this different because you do have project specific hard data that was used, which then seems to me your complaint is that it's not activity specific, not that it's not project specific and not that it's not just modeling. Is that correct? No. And also that the data you're referring to is not detrimental disturbance data. It's fire. It's fire impacts on soils, which is a totally different issue. Fire impacts on soils basically burns up the duff layer. So detrimental disturbance has to do with soil compaction from use of heavy equipment, prior logging. And even in this case, even with reference to what data they had, which was visual, you know, going out and looking, for determining or estimating the compliance with the 15 percent standard, they excluded, you know, certain characteristics. Okay. But see, now you're changing your argument. And I'm trying to understand your argument. Your brief says there's no data. Now you're telling me there's data, but you disagree with what it measured and where it measured. So there is data, but you're now saying that their visual observation, you know, isn't appropriate for looking at subsurface, you know, soil characteristics. Is that right? The data I'm saying, because your brief is at odds with what you're now telling me now. So I'm just trying to square your precise argument. Well, the data I was referring to is from the burn severity. What I'm saying is that that is not relevant. And so that's not relevant. The estimations, which, you know, I'm sorry if I confuse it, but their estimations of compliance with the standard are based aren't based on that data or certainly they're not based on relevant data for the activity areas and units. It's just sort of an extrapolation, a qualitative extrapolation. That doesn't seem to make a lot of sense. Your experts were excluded from the district court's analysis. If admitted, what would they have added to your case? Well, you know, both of those declarations were before the court. And also because when we this court was, I mean, this case was kind of procedurally unique, originally proceeded on preliminary injunction motion. And there were voluminous declarations offered by the Forest Service on why we were wrong. And so in part, both of those declarations were offered to respond to the declarations being offered by the Forest Service. So I think it just goes to show that, you know, that the record itself wasn't complete enough to allow for analysis of these issues. What about the settlement? One question I had is if you have the study or the determination conducted on this overall area, and then there's a settlement and some of the area is taken out, does the whole thing need to go back and figure out for the remaining portion whether it's compliant with the various, either NIFA or NEPA? Or do you think that the settlement can be segregated from the case that's in front of us now, which included part of the settlement? Right. I don't think that the settlement actually affects the issues in this case at all. First of all, the issues in that case were distinct from the issues in this case. And second of all, as I think the government's supplemental letter or whatever makes clear, it doesn't eliminate the issues. It just sort of says, well, instead of this many acres, we're only affecting this many acres. And the arguments are forest-wide arguments with species viability, so it doesn't really make any difference if you're logging only 600 acres instead of 1,000 acres. Is there any merit to our referring this case to mediation? Is there possibilities of constructive settlement? I don't believe that there are, simply because the you know, I mean, we certainly offered to participate in settlement negotiations over this particular sale, because our concerns are forest-wide, which we're using this sale to raise these issues. And if the Forest Service had been willing to address the forest-wide issues, my clients would have been willing to allow some logging to go forward. But that was basically shot down by the Forest Service. So my understanding is that we explored that, and the Forest Service wasn't willing to address those issues, such as developing conservation strategies and so forth. Okay, well, I'm going to have to quickly the two issues that I think are important for presidential issues are the ones that I'm going to have to glance over now, and those are the old-growth enhancement issue. And, you know, simply put, Your Honors, the Forest Service for decades has unsustainably and overcut old-growth timber, and now that they've been stopped by various species concerns, they're basically trying to keep going. They want to keep logging old-growth habitat, only now they're going to call it an enhancement instead of timber harvest, and say that, oh, old-growth logging is good for old-growth species. There's absolutely no science to support that. According to the leading speculative untested hypothesis, and we urge this court to apply the same requirement for methodology validation and verification from Lands Council. What about the Hillis study? Excuse me? What about the Hillis study? The Hillis study says that it's very good at fireproofing these forests and does nothing to address the impacts on species. And the other issue that is of sort of first impression is blackback woodpecker viability. Repeat that again, please. Why don't you speak up a little bit, or maybe move the microphone up. We're having some trouble hearing. The other issue of first impression is regarding blackback woodpecker viability. Blackback woodpecker. Yes. And this just happens to be a politically incorrect species that is difficult to deal with. And so the Forest Service has just chosen not to deal with it. And the reason it's difficult is not only because it happens to need the same sort of habitat that the Forest Service is trying to eliminate. It likes what, burned over areas? It likes catastrophically burned forests and beetle epidemic infested forests. And obviously the National Forest Plan is designed to eliminate both of those through thinning and treatments. And the other problem with the blackback woodpecker is important to understand is that unlike most resident species, because of its sort of the fact that the habitat is only good for six years and then it doesn't have enough food source left and has to move on to other recently burned forests or beetle epidemics, it's a rather nomadic species that crosses national forest boundaries and requires some sort of regional approach. And if there ever was a species that cried out for a regional conservation strategy, this is it. And the reason the Forest Service seems unwilling to address its needs again is because it just happens to conflict with their policies of eliminating it. You know, that's easy to say, but when it sounds like good rhetoric for a news article, what I'm trying to figure out, and that doesn't help me decide this case. Because I have, I go and I look in the record, I look at your sites and I look at their sites and they say, well, you've got 90 percent of this habitat maintained, so these particular woodpeckers can actually do okay here. You say no, but we have this evidence that they are, and it's an arbitrary and capricious standard. So if you're going to make that argument, which may well be a legitimate argument, then I guess I need to understand where their conclusions go wrong or where they lack some basis in the record. Sure. Yeah, first of all, they haven't offered evidence this species is okay, just basically unsupported conclusions of their experts, but you have to balance that. Wait a second. You know that when you say they've offered unsupported conclusions of their experts, they have expert testimony of people who are supposed to be the expert in this area. You would have the court come in and somehow swoop down and undermine these experts, and that's not really our job. I mean, maybe you can disagree with their experts for sure, but what do we look at to say that their experts didn't give it a fair look or a hard look? Well, for one thing, their expert admitted they have no idea how much habitat the blackback woodpecker needs, which totally undermines the assumption that it's okay to sacrifice 10 percent. For another thing, the 10 percent figure is misleading because Plum Creek went in and eliminated all of the blackback woodpecker on adjoining lands that were burned in the same fire, and so did some other ones that we don't know how much the acreage was. But cumulatively, it's a 20 percent reduction, and they didn't consider the cumulative effects of 20 percent reduction because they can't even support 10 percent. I mean, here's the thing, Your Honor. 74,000 acres burned in this wildfire. According to Forest Service experts, only 10,000 acres of that was suitable blackback woodpecker. Why? And then they say, well, and we're only logging 1,000 acres approximately of blackback woodpecker habitat. But if you don't know how much habitat the species needs, and you know that, you know, you don't have a conservation strategy and that its needs are, you know, over space and time, then you don't address, you know, where the next level of habitat is going to come from six years from now. How can you justify sacrificing any of its habitat? You had 64,000 acres of non-blackback woodpecker habitat to design a salvage program from, a salvage sale from. Why couldn't they have just avoided that 10,000 acres? They don't have any idea. It's just speculation without any scientific support. There's no population trend data that they can point to. There's nothing they can point to to show the species is even viable. So it's, you know, the court's role is just to make sure that their experts' conclusions are well-grounded in science. And in this case, they're not well-grounded in science, because when passed, they admitted they have no idea how much habitat it needs. And is that in the Hillis study, or where is that, where it says they don't know? It's included in the supplemental excerpt for record, I think, or it's in the excerpt for record. Could you also provide us a citation, a record citation for that statement that they say that they have no idea how much habitat this blackbacked woodpecker needs? Thank you. Thank you, Your Honor. I think you're over your time, but we'll give you a little bit of time for rebuttal. I appreciate that. May it please the Court. Aaron Avila on behalf of the Federal Defendant's Appellees. I'm kind of at a loss as to where to start today, because I heard an awful lot of arguments that came up for the first time. So I'll do my best. But with respect to the soils, I'd just like to point out that there was on-the-ground transects done before the EIS that was done, and some of them did go into the activity areas that cover the timber activities in this case. In addition, there was the Lands System Inventory, which provides a map of the entire area and tells you what the soil's geology, the land's form, the vegetation of particular areas are. The Bayer Report, which is done immediately following the fires, went out and assessed the bird severity of the soils. In addition, the Forest Service... On the soils testing issue, how do you assess Lands Council and what we said there? Well, I think we did what Lands Council says. We had an on-the-ground analysis. We had the LSI data. We had the Bayer data. We also analyzed the impacts in the proposed activity areas from jammer roads, fire lines, skid trails, high burn severity. We looked at the current state of the soils and activities that had taken place there. I don't think anything in Lands Council requires us to do anything more than that. Okay, so as I understand the thrust of their argument, just so you can respond, is that I guess it's two parts. One, that the fire-related studies are irrelevant because they're really not getting to, they're not, quote, getting underneath it in terms of the subsoil structure, so that that's irrelevant data. And second, that what you did was in the project area but not the activity area. So I think those are, as I heard, they're two arguments. I'll take the second one first. There are transects that go through the activity area. There wasn't at the time of the FEIS, there will then be subsequent walk-throughs of all of the activity areas. But there weren't transects through every single activity area. Although the analysis, and that's just the transects, just the on-the-ground analysis. The rest of the stuff I discussed, the BEAR report, the LSI, does cover all of the activity areas, all of the project. So it's the whole project area, which includes the activity area by definition. Yes. The first question I think was the first time, and now I'm forgetting exactly what the argument was, but if Your Honor could help me out. Well, I understood the argument, and I don't want to misstate it, but I understood their argument to be detrimental disturbance issues that might occur in the activity area would not be reflected in, you know, surface activity that would be revealed by BEAR. Right. Well, in addition, we've looked at the historical activities in the area. I mean, so it's not just the BEAR report. We looked at the past activities in the area. So I think that resolves that question. I also want to note that what counsel is referring to this 15 percent standard, it's actually from the Forest Service manual, which is non-binding on the Forest Service. In this project, we did follow that standard, but I just want to, in his reply brief, there's a lot of talk about following our own regulations and things like that, but all of the citations for that are to the manual, not, which is well settled in the circuit, is not binding on the Forest Service. So I just wanted to clarify that. I'd also note that in his reply brief, he talks about 274 acres being harvest activity on burnt soils or severely burnt soils. In fact, it's only 72 acres, and that's at page 236 of the supplemental excerpts of record. In a footnote, we're taken to task for not disclosing the natural recovery value of the jammer rows. First, it's contended we didn't take into account jammer rows and how those affect soil qualities. Would you address that in a footnote in your brief? It was originally a footnote in their brief as well. Right. And we did. So I guess we just have to go in and reread those. And then in reply, though, there's another footnote. It's not all the footnotes. It talks about we were asked about that Ecology Center doesn't know what these natural recovery values, and unfortunately, since it came up for the first time in his reply, it's not in the supplemental excerpts of record, but at pages 126 through 129, 3-126 to 3-129, there's a discussion of natural recovery values. Are you referring to the administrative record now? Yeah. That's the FEIS, the page in the FEIS, and I'd be happy to provide the Court with a copy of that. But, again, just because it came up on reply, it wasn't in our supplemental excerpts. And so the record clearly took into account jammer rows here. And I'd also like to note that one of the very purposes of this project is to restore soils. This was a 74,000-acre fire on the Willow National Forest, which, as the record makes clear, in the past three years there had been in the hundreds of acres of fires. So one of the very purposes of this project is to restore watersheds and to reduce the effects of soil erosion and to repair the soils. So just the project itself includes soil stabilization activities, road decommissioning, and the installation of best management practices on those existing roads that are going to be repaired to reduce soil problems. In addition, roads are going to be decommissioned as part of this project. So I just wanted to address some of those soils issues up front, and if the court has any other questions about that, I'll move on to the enhancing old growth issue real quick. Ecology Center doesn't challenge the conclusion at all in the FEIS that these stands where thinning activity will occur are at greater risk for bark beetle infestation and uncharacteristic stand-replacing fires. There's no challenge to that. The Forest Service, in its discretion, and as the manager of these lands, is now going to thin out some of the smaller diameter trees to reduce that risk, thereby improving and helping to improve the chances that this old growth habitat will continue to be around. And the Hillis study very much supports that. He found foraging pileated woodpeckers, he noted that the characteristics of the stands had the characteristics of pileated woodpecker nesting habitat. So the record more than demonstrates how this project- You made the statement, Hillis doesn't address the species, but that's not actually- it does talk about the species, correct? My recollection is that it talks specifically about the pileated woodpecker, and I believe the famulated owl, as relevant to this case, the pileated woodpecker. By remembering it right, it talks exactly about seeing foraging pileated woodpeckers, and that the area has the characteristics of pileated woodpecker nesting habitat. And again, much like in the district court, the ecology center leaves out the ellipse in the Hillis quotation that talks about the stand resembled historical conditions, which I think is telling. With respect to- I'd also note that the number of acres that are impacted by this project are very minimal. It's less than 3% for the pileated woodpecker, and although the FBIS acknowledges that there's the potential for snag loss on 3%, at the same time, there's also going to be underburning, which will create new snags, and that'll occur on about 2%, so there'll be an offset there from the potential for snag loss and the snags that may be created. How about the black-backed woodpecker? Well, a lot of this that we heard today was the first time I've heard a lot of it, and it's not in the brief. We addressed the notion that, and this is what the primary argument on appeal was in the opening brief, was that we hadn't disclosed information that was about historical fires or something to that effect, when in fact we had disclosed what the fires were like in 1998, 1998, 1999, 1997. We're only going to be treating 11%- activities will only be taking place in about 11% of the potential habitat in this area. The activities are also designed with design criteria that based on the best available research on this to minimize the potential for any loss of habitat. There's nothing in the record that makes that conclusion arbitrary and capricious in this case, and that's another thing. I mean, we're dealing with a record review case here, and where there's conflicting expert opinion, an agency is entitled to rely on its experts, and here we don't even have conflicting expert opinion in the record. So I think that combined with the fact that 74,000 acres burned on the Lolo National Forest in 2000, there's nothing in the record that renders the agency's decision on this score arbitrary and capricious. I guess what the argument was, it was twofold. If you didn't know how much habitat this bird needed, then it would be hard to say that taking away 10% or some other amount would not impact the viability of the species. And so the statement was made that the Forest Service has no idea how much the habitat needs of this species are. Do you have a response to that argument? Well, I guess my response is that we aren't going to take away 10% of its habitat, I mean, in the sense that there's design criteria to prevent that. And so I disagree with the premise of the argument that in order to come to the conclusion that we aren't impacting the viability of the species where we're only treating 1,000 acres out of 9,100 acres is not arbitrary and capricious in this case. And... Well, the other point made was that, of course, if you're looking at this project, but if there had been prior logging that decreased premium habitat that's adjacent to this, then you need to look at the cumulative effect and not just narrow in on this project. That literally is the first time I've heard that argument was today. I thought they made that argument in their brief that the adjacent landowners clearing away of snags had some cumulative impact with what this project was doing. He says in the brief, what about the huge cumulative effects problem of chipping away at this habitat? One, we can't control what other landowners do. I know, but you were arguing that this is the first you've heard that argument here today. At least I thought the argument was made in their brief. Well, I didn't recall having ever read about a landowner who... In other words, the notion that Plum Creek was logging is new, not the cumulative effects. Nor was it. We analyzed what this project's impact would be on blackback woodpecker habitat. You did not take into account adjoining logging, is that right? I'm sorry? You did not take into account adjoining logging, is that correct? I think we did. Where in the record does that show? Well, in each of the sections of the FEIS, they talk about the cumulative effects on these habitats, and they talk about reasonably foreseeable activities. And I don't know of any planned logging that wasn't discussed in the FEIS. On this issue of this blackback woodpecker, are there issues that deserve to have a trial? Are there issues that could be decided in a trial setting rather than on summary judgment that would give a more accurate picture? Well, no. I think this is an Administrative Procedure Act case, so the decision riser falls on the administrative record. It wouldn't be appropriate to have a trial, would it, with respect to the summary judgment motion, either have the record or a supplemented record, correct? Correct. Let me ask you the question that I asked opposing counsel. Is this a case which would benefit from mediation? Well, we were in the Ninth Circuit mediation program at the outset of this case. I wasn't the counsel involved in those discussions. And, of course, the government is always open to settlement discussions, but my understanding is that we were released from the mediation program. Well, there can always be a change of heart. There is. But that's where things were left last and briefing proceeded. So like I said, though, we would be willing to give it a shot. I mean, we're always open to settlement discussions. But given the way things ended up before we briefed, I doubt that it would be any different. Well, I'm sure the goal of the government and this court and opposing counsel is to conduct these procedures in the way that is most felicitous to preservation of species,  and it's quite antithetical to think that we have to battle these things out on technical points in court if there are reasonable solutions that reasonable people can agree are the best resolution. I agree, Your Honor. But I also think that the Forest Service is the agency charged with managing these lands, and under the arbitrary and capricious standard of review, I mean, one is supposed to make their record before the agency, and that helps improve agency decision-making. That's what the Administrative Procedure Act and just last term, the Supreme Court in the Department of Transportation v. Public Citizen case reiterated the notion that people who are going to challenge agency action should make their record before the agency so that the agency can take those into account and get better agency decision-making. For instance, so I agree, Your Honor, but the time for this is during the administrative process when the people who know, and this biologist and the scientist can take these things into account and come to the best decision possible. What about the settlement? Do you agree with Mr. Woodbury that the settlement doesn't really have any effect on our deciding this case? Well, I will say that I'm not too sure what he means by that. As far as the merits of the case go, I think there's still a live controversy, and the ROD, the record of decision in this case, authorizes a particular set of activities, and that rises or falls, for lack of a better term, on this record. And so I do think that there's still a live legal controversy because there will be activities that are going forward that point at this challenge in this case. I guess maybe I saw it a little differently in my question, and I think he answered it in that respect. I mean, it's not a moot case. Right. The question is whether in issuing its ROD, if the Forest Service included the other acreage, did that in any way influence the overall ROD? Or can you, you know, chop off a piece, in effect, of the acreage and say, but the ROD still applies in full force to this remaining acreage, and therefore just decide the case? I think you can do that. Okay. And you're saying that there will be no change in the way the agency wants to proceed in this part of the project? Not currently, but, I mean, again, to the extent of the extent of the extent of the I mean, after the settlement agreement, that sets forth what we're planning on doing. I can't speak to what future circumstances may or may not dictate, but these are the sets of activities that are authorized by the record of decision in this case. But you can't say that because of the settlement, the agency would want to make some changes? I'm not sure I understood the question. I'm sorry. Well, the settlement is going to make some changes in what the agency does as to this other part. Would it contemplate changes in the remainder part of the project in light of the settlement? No, I don't think so. Or you don't know? I don't know, but I don't think that that's the settlement agreement only takes out a portion of the timber thinning activities, and that's the only change that settlement agreement put forth. It requires. I understand that. So I don't think there's any other contemplated changes to the project. Thank you. Unless the Court has any questions. No, thank you. Thanks. Thank you. We have one minute for rebuttal. I just wanted to point out a couple of quick things. The transects that counsel referred to were done, that were done post-decision. I think maybe even post-litigation in the lower court. I'm not sure. But part of that new information that was included in the record but was post-decisional is the reason that it was necessary to submit the Jewell declaration. And Mr. Jewell responds specifically to that. And I think that his analysis of the record would be helpful to the Court on that issue. And then, again, on the issue of old growth enhancement, since we don't know what impact logging has on species density, or basically once you go in and log old growth habitat in Ololo, which they've done, they haven't told us, well, what effect does this have on the number of species. You would think at least that they could tell us, well, we have regional one, that we're supposed to be applying and apply to this case, and here's what the characteristics are before logging and here's what it is after logging. They don't even do that. They don't even provide us with that type of analysis. In fact, they don't even identify, in this case, where the old growth is. They just call everything replacement old growth, which is a definition that Ololo has developed that basically reduces the tree size and age and so forth to sort of capture everything. We have your point on that issue. So thank you. Thank both counsel for argument. The case of Ecology Center v. Austin is submitted. We'll take a short break, and in the meantime, Native Ecosystems.
judges: B. Fletcher, McKeown, Gould